MARITIME VENTURES, LLC, ET AL. *v.*
CITY OF NORWALK ET AL.
(AC 24638)

Foti, Dranginis and Peters, Js.

---

Argued May 27—officially released September 14, 2004

*Michael S. Taylor*, with whom were *Kimberly A. Knox* and *Wesley W. Horton* and, on the brief, *Kenneth*

*J. Bartschi, Thomas W. Bucci* and *Charles J. Willinger*, for the appellants (plaintiffs).

*Jonathan S. Bowman*, with whom were *Barbara M. Schellenberg* and, on the brief, *Stewart I. Edelstein*, for the appellee (defendant Norwalk redevelopment agency).

*Stephen J. Conover*, for the appellee (defendant French Norwalk, LLC).

*Opinion*

FOTI, J. The plaintiffs, Maritime Ventures, LLC, and Maritime Motors, Inc., appeal from the judgment of the trial court, rendered after a trial to the court, denying a preliminary and permanent injunction prohibiting the defendants, the city of Norwalk (city), the Norwalk redevelopment agency (redevelopment agency) and French Norwalk, LLC (French), from acquiring by eminent domain, in furtherance of an urban redevelopment plan, properties owned by Maritime Ventures, LLC, and leased by Maritime Motors, Inc. On appeal, the plaintiffs claim that the court (1) improperly denied the injunctive relief they sought because there was no evidence that the defendants had attempted to integrate their property into the redevelopment plan, (2) improperly concluded that the defendants took all reasonable steps necessary to acquire their properties by negotiation and (3) improperly concluded that a new finding of blight was not needed when the 1983 redevelopment plan was amended in 1998. We disagree with the plaintiffs' claims and affirm the judgment of the trial court.

The court reasonably found the following facts. On October 19, 1983, the redevelopment agency, an agency of the city, passed resolution no. 83-5 to approve the "Urban Renewal Plan for Reed Putnam Project Area" (1983 plan). The 1983 plan described the blighted area subject to the redevelopment plan: "The Norwalk River

area from [Interstate 95] Turnpike to the South Norwalk Business District, and west toward West Avenue, has deteriorated over the past forty years due primarily to the adjacent Norwalk Landfill. This deleterious use, coupled with the heavy industrial nature of the railroad yards and the Danbury branch, has caused properties in the Reed Street and Putnam Avenue corridor to become seriously blighted. Light industrial and commercial uses in the area are antiquated, and the road system is inadequate for modern requirements."

Recognizing the "unique location" of the Reed Street-Putnam Avenue corridor for contributing to Norwalk's revitalization, the 1983 plan identified five objectives to develop the area: (1) to create development opportunities for an appropriate mix of uses, including office, retail, residential, hotel and nonprofit institutions, (2) to increase the tax base of Norwalk, (3) to allow public access to and enjoyment of the Norwalk waterfront, (4) to increase housing for Norwalk residents and (5) to increase job opportunities for Norwalk residents. To achieve its objectives, the 1983 plan set forth, in relevant part, the following proposed actions: "The Norwalk Redevelopment Agency will acquire and offer for redevelopment those parcels whose condition warrants clearance or whose acquisition is necessary to provide an adequate unit of development. Those buildings compatible with the overall design are designated not to be acquired, and are slated for preservation." The 1983 plan designated the plaintiffs' properties for acquisition and demolition.

The common council of the city adopted the 1983 plan on October 25, 1983. In its resolution approving the 1983 plan, the common council recognized that the redevelopment agency had "made detailed studies of the location, physical condition of structures, land use, environmental influences, feasibility and potential for rehabilitation, and social, cultural and economic condi-

tions of the project area, and has determined that the area is a deteriorated, deteriorating, sub-standard and blighted area and that it is detrimental and a menace to the safety, health and welfare of the inhabitants and users thereof and of the locality at large."

In the mid-1990s, the redevelopment agency determined that it was necessary to review the 1983 plan. The redevelopment agency conducted meetings with community groups, elected officials and interested parties, and retained an expert to review the 1983 plan and propose amendments to the plan. The agency subsequently held public hearings on the proposed amendments.

On November 22, 1996, the redevelopment agency sent a memorandum to the planning committee of the common council regarding the 1983 plan. The memorandum recommended the initiation of discussions on amending the 1983 plan. On December 18, 1996, the redevelopment agency authorized retaining Cecil and Rizvi, Inc., to update and revise the 1983 plan.

On September 24, 1997, Cecil and Rizvi, Inc., presented to the redevelopment agency its proposed amendments to the 1983 plan. The proposed amended 1983 plan was approved by the Norwalk planning commission on October 15, 1997.

In November, 1997, the redevelopment agency sent a letter to the property owners within the Reed Street-Putnam Avenue area, inviting them to a public information session, followed by a public hearing, on the proposed amended 1983 plan. The redevelopment agency also published notice of the information session and public hearing in the Norwalk Hour newspaper. The information session and public hearing were held on November 19, 1997.

The redevelopment agency approved the revisions to the 1983 plan on December 17, 1997. Subsequently, on

February 10, 1998, the common council approved the amended 1983 plan (1998 plan).

The 1998 plan states that the 1983 plan was amended because: "There have been significant changes [since the 1983 plan was initially approved] in the regulations pertaining to environmental controls on development, as well as in the regional economy affecting the area real estate markets. The [1983] Plan has been revised and restated herein to provide a better fit between the goals of the community and the development opportunities available. This includes not only matching development parcels with prospective users, but also a better articulation of objectives relating to urban design and landscape requirements, in order to ensure development of a high quality environment consistent with the long term planning goals of the City of Norwalk."

The 1998 plan described the scope of its revisions: "In general, the overall approach and structure of the original Plan as established by State statute have been maintained. However, changes have been introduced to the parcelization patterns, land use plan, urban design guidelines, and regulations on development. These revisions are intended to capitalize on the current development potential of the area without losing sight of the general objectives originally identified by the [1983] Plan and the best interests of the City."

In addition to retaining the same objectives as the 1983 plan, the 1998 plan also sought to (1) identify solutions to the traffic and parking issues generated by the new developments, (2) consider views and visability from different development parcels, and (3) promote a high quality urban environment. The 1998 plan addressed the same revitalization area as did the 1983 plan.

In 1999, the redevelopment agency commissioned Allan Davis Associates to determine what roadway

improvements would be necessary to accommodate the implementation of the 1998 plan. The modifications suggested by Allan Davis Associates, which were ultimately approved by the state traffic commission, called for the widening of West Street and Reed Street, and a railroad crossing at Reed Street. Those modifications would require the taking of part of the properties located at 51 West Avenue and 31 Putnam Avenue.

Maritime Ventures, LLC, is a limited liability company in Connecticut and has an ownership interest in Maritime Motors, Inc., a Connecticut corporation. Maritime Motors, Inc., sells and services new and used Chevrolet motor vehicles. On April 18, 2000, Maritime Ventures, LLC, obtained title to 51 West Avenue and 31 Putnam Avenue from Thomas Pellitteri. Maritime Ventures, LLC, then leased the properties to Maritime Motors, Inc., pursuant to an oral lease. The property located at 51 West Avenue has a two-story showroom building and a display parking lot for sixty vehicles. The property located at 31 Putnam Avenue is used to display new vehicles and for storage.

At the time that Maritime Ventures, LLC, purchased the properties, it knew that the properties were included in the area subject to the 1983 and 1998 plans and were designated for acquisition by either purchase or condemnation. Subsequently, French, the designated redeveloper under the 1998 plan, initiated discussions with the plaintiffs to acquire their properties, but they were unwilling to sell.

On January 25, 2002, the plaintiffs initiated this action, seeking preliminary and permanent injunctive relief. Specifically, the plaintiffs sought an injunction to prohibit the city from acquiring their properties by eminent domain.

Following a trial to the court, the court held that the plaintiffs had failed to prove that the decision of the

redevelopment agency to acquire the plaintiffs' properties by eminent domain was unreasonable or in bad faith or was an abuse of power. Accordingly, the court denied the plaintiffs' claim for temporary and permanent injunctive relief and rendered judgment in favor of the defendants. This appeal followed.

Prior to reviewing the plaintiffs' claim, we state the general principles that guide our review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . .

"[T]he governing principles for our standard of review as it pertains to a trial court's discretion to grant or deny a request for an injunction [are]: A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion." (Citations omitted; internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport,* 259 Conn. 592, 598, 790 A.2d 1178 (2002).

I

The plaintiffs first claim that the court improperly denied the injunctive relief they sought because there was no evidence that the defendants had attempted to integrate their property into the redevelopment plan. We disagree.

Under the 1998 plan, property in the redevelopment area could not be used for an automobile showroom. The plaintiffs were selling new and used vehicles on their properties, which was prohibited under the 1998 plan.

In its memorandum of decision, the court found that it was reasonable and necessary for the city to take the plaintiffs' properties to effectuate the redevelopment plan. In so doing, the court stated that there was "no evidence presented that the defendants considered the integration of the [plaintiffs' properties] into the overall redevelopment plan." The court noted that it had not been provided with any authority, nor was it able to locate any, to support the proposition that there is a duty for a redevelopment agency to integrate a business that is not a permitted use under the approved redevelopment plan.

"The [r]edevelopment [a]ct authorizes the taking of land in an area which has been determined by the [redevelopment] agency to be a redevelopment area. . . . General Statutes § 8-125 (b) provides in relevant part that [r]edevelopment area means an area within the state which is deteriorated, deteriorating, substandard or detrimental to the safety, health, morals or welfare of the community. An area may consist partly or wholly of vacant or unimproved land or of land with structures and improvements thereon, and may include structures not in themselves substandard or insanitary which are found to be essential to complete an adequate unit of development, if the redevelopment area is deteriorated, deteriorating, substandard or detrimental. . . . Thus it is clear that the legislature has delegated to each redevelopment agency the power to determine, within certain limits, what property it is necessary to take in order to effectuate a complete redevelopment plan which the agency has adopted. . . .

"The determination of what property is necessary to be taken in any given case in order to effectuate the public purpose is, under our constitution, a matter for the exercise of the legislative power. When the legislature delegates the making of that determination to another agency, the decision of that agency is conclusive. . . . The agency's decision, however, is open to judicial review only to discover if it was unreasonable or in bad faith or was an abuse of the power conferred. . . . The redevelopment agency is permitted to determine, in good faith, what land it is necessary to appropriate in order to accomplish the public purpose. It is proper for a redevelopment agency, acting in pursuance of the act, to fix, within reasonable limits, the area of redevelopment and to include in a taking all property which is in a deteriorated area, even though certain of the properties are not in themselves substandard. . . .

"Although, [t]he determination of what constitutes a redevelopment area and what property is to be taken is primarily a matter for the redevelopment agency . . . its decision is open to judicial review . . . to discover whether it has acted unreasonably or in bad faith or has exceeded its powers. . . . The inclusion within the area of certain properties which are not substandard does not constitute unreasonable or arbitrary action, because it is the condition obtaining as to the entire area and not as to individual properties which is determinative. . . . The legislature, however, has prescribed in the definition of a redevelopment area that the agency shall include [only] properties which are found to be essential to complete an adequate unit of development. . . . Therefore, property that is not substandard and that is the subject of a taking within a redevelopment area must be essential to the redevelopment plan in order for the agency to justify its taking." (Citations omitted; internal quotation marks omitted.)

*Pequonnock Yacht Club, Inc.* v. *Bridgeport,* supra, 259 Conn. 599–601.

Relying on our Supreme Court's decision in *Pequonnock Yacht Club, Inc.* v. *Bridgeport,* supra, 259 Conn. 592, the plaintiffs claim that the redevelopment agency was obligated to consider integrating their properties into the redevelopment plan. Because the defendants did not attempt to integrate the plaintiffs' properties into the plan, the plaintiffs contend that the court improperly denied their request for injunctive relief because there was no showing that their properties were essential to the plan. The plaintiffs' reliance on *Pequonnock Yacht Club, Inc.,* however, is misplaced.

In *Pequonnock Yacht Club, Inc.,* the defendants, the city of Bridgeport, the Bridgeport redevelopment agency and the Bridgeport port authority, appealed from the judgment of the trial court ordering them to reconvey to the plaintiff property that was taken by eminent domain. Id., 593. The plaintiff operated a yacht club and marina on its property, located in a redevelopment area. Id., 594–95. It was uncontested that the plaintiff's property was in good condition and not substandard. Id., 594. Prior to the property's being taken by the defendants, the plaintiff "made numerous efforts to discuss with the defendants the integration of its property into the . . . redevelopment plan." Id., 595. The defendants, however, rejected the plaintiff's attempts to discuss how its property could be integrated into the plan. Id., 596.

Our Supreme Court, in affirming the judgment of the trial court, stated that its earlier decisions established that "a redevelopment agency must make reasonable efforts to negotiate and consider the integration of the *property that is not substandard* into the overall redevelopment plan." (Emphasis added.) Id., 603. The court concluded: "[I]t is unreasonable for a redevelopment

agency, even with broad legislative authority delegated to it, arbitrarily to reject repeated requests to negotiate some form of assimilation into the overall redevelopment plan *when the subject property is in good condition and is economically viable.*" (Emphasis added.) Id., 606.

Our Supreme Court's decision in *Pequonnock Yacht Club, Inc.*, while requiring a redevelopment agency to consider the integration of property that is *not* substandard, does not require a redevelopment agency to consider the integration of property that is substandard or, as in the present case, a prohibited use under the redevelopment plan. The plaintiffs have provided us with no authority for the proposition that a redevelopment agency is required to consider the integration of property containing a prohibited use under the plan.

To require a redevelopment agency to consider the integration of property that contains a prohibited use under the redevelopment plan would defeat the intent of redevelopment. The declared public policy of redevelopment is the elimination of "substandard, insanitary, deteriorated, deteriorating, slum or blighted conditions . . . [and] preventing recurrence of such conditions in the [redevelopment] area . . . ." General Statutes § 8-124; *Gohld Realty Co.* v. *Hartford*, 141 Conn. 135, 143, 104 A.2d 365 (1954). Requiring the redevelopment agency to consider the integration of property that contains a use that is prohibited under the redevelopment plan would severely limit a redevelopment agency's ability to remediate blighted areas and would interfere with the redevelopment plan.

As noted earlier, the legislature has delegated to redevelopment agencies the power to determine what properties are necessary to take in order to accomplish the public policy behind redevelopment. To effectuate a complete redevelopment plan, a redevelopment agency

must be given the power to take those properties that are needed to eliminate blight in a redevelopment area. Although requiring a redevelopment agency to consider the integration of property that is *not* substandard into a redevelopment plan does not inhibit the effectuation of the public policy of removing blight, requiring a redevelopment agency to consider the integration of property that *is* substandard or contains a prohibited use unnecessarily infringes on the broad discretion that the legislature has delegated to the redevelopment agency to remove blight in a redevelopment area. A redevelopment agency, therefore, is not under a duty to consider the integration of a property that contains a prohibited use under the redevelopment plan. Accordingly, the court properly found that the redevelopment agency did not have a duty to consider the integration of the plaintiffs' properties into the redevelopment plan.

## II

The plaintiffs next claim that the court improperly concluded that the defendants took all reasonable steps necessary to acquire their properties by negotiation. We disagree.

The following facts are relevant to our resolution of that claim. On April 18, 2000, Maritime Ventures, LLC, purchased the properties that are the subject of this appeal. On May 7, 2001, the city entered into a land distribution and development agreement with French for the Reed Street-Putnam Avenue area. Subsequently, beginning on May 21, 2001, French sought to initiate discussions with the plaintiffs for the acquisition of the plaintiffs' properties.[1]

---

[1] Prior to entering into the land disposition and development agreement with the city, French had discussions with the plaintiffs about the private acquisition of their properties. For purposes of this issue on appeal, however, we only concern ourselves with those discussions that occurred after French became an agent of the city.

In its memorandum of decision, the court, in finding that the defendants had exhausted all reasonable efforts to acquire the plaintiffs' properties by agreement, relied on a letter from Timon J. Malloy, president of French, to Peter Morley, the plaintiffs' president, a letter from Marc J. Grenier, an attorney for the city, to Charles J. Willinger, Jr., an attorney for the plaintiffs, and "the testimony regarding other discussions that took place . . . ."

It is the plaintiffs' contention that those findings of fact by the court were insufficient to establish that the defendants had exhausted all reasonable steps to acquire the plaintiffs' properties by negotiation. Rather, the plaintiffs claim that the evidence relied on by the court failed to establish that any steps were taken by the defendants to acquire the properties by negotiation.

We conclude that the court's factual findings were supported by the evidence and were not, therefore, clearly erroneous. On May 21, 2001, Malloy's letter to Morley informed the plaintiffs that French's agreement with the city had been finalized and that French would be acquiring their properties. The letter stated that French would prefer to acquire the plaintiffs' properties amicably, but that the city would use its power of eminent domain if it were necessary. Recognizing that development on the plaintiffs' properties would not occur immediately, the letter informed the plaintiffs that it had made a special arrangement with the city to allow them to remain on their properties until it was to be developed.

On November 9, 2001, in the letter from the city, the plaintiffs were once again informed that French was the designated redeveloper under the urban renewal plan. The letter stated that if the plaintiffs and French were unable to reach an agreement on the acquisition

of the properties, the city would acquire the property through the use of its power of eminent domain.

Contrary to the plaintiffs' contention that all the negotiations between French and the plaintiffs about the acquisition of the plaintiffs' properties occurred prior to French entering into the land development agreement with the city, the court heard the testimony of Thomas S. Jones, the on-site manager for French for the redevelopment project. Jones testified that after French entered into the development agreement with the city, he had discussions with Morley regarding the acquisition of the plaintiffs' properties. Jones testified that approximately one to two months after the May 21, 2001 letter was sent to Morley, he had a telephone conversation with Morley, and attended a meeting with Morley and Morley's attorney. During those conversations, French attempted to purchase the plaintiffs' properties. There were also discussions in which French would purchase the plaintiffs' properties and lease it back to the plaintiffs. Jones testified that Morley had "no interest" in selling the properties to French. Morley also rejected French's offer to enter into a long-term option, where the plaintiffs would continue to own their properties, but French would have an option to purchase them in the future.

Accordingly, there was ample evidence before the court for it to have concluded that the defendants had exhausted all reasonable efforts to obtain the plaintiffs' properties by agreement. Therefore, the court's finding was not clearly erroneous.

III

The plaintiffs last claim that the court improperly concluded that a new finding of blight was not needed when the 1983 redevelopment plan was amended in 1998. We disagree.

Under the Connecticut Redevelopment Act, General Statutes § 8-124 et seq., "a redevelopment area is defined as one which is deteriorated, [deteriorating] substandard or detrimental to the safety, health, morals or welfare of the community. . . . It is with reference to such an area that a local redevelopment agency is authorized to prepare a plan for redevelopment and, in the execution of the plan, take private property by condemnation. . . . Private property taken for the purpose of eradicating the conditions which obtain in such areas is taken for a public use." (Citation omitted; internal quotation marks omitted.) *Aposporos* v. *Urban Redevelopment Commission*, 259 Conn. 563, 571, 790 A.2d 1167 (2002).

"General Statutes § 8-127 provides in relevant part that [b]efore approving any redevelopment plan, the redevelopment agency shall hold a public hearing thereon, notice of which shall be published at least twice in a newspaper of general circulation in the municipality, the first publication of notice to be not less than two weeks before the date set for the hearing. The redevelopment agency may approve any such redevelopment plan if, following such hearing, it finds that: (a) The area in which the proposed redevelopment is to be located is a redevelopment area . . . ." (Internal quotation marks omitted.) *Aposporos* v. *Urban Redevelopment Commission*, supra, 259 Conn. 572–73.

General Statutes § 8-136 provides that a redevelopment plan can be modified at any time by the redevelopment agency. When, however, the proposed modification substantially changes the original redevelopment plan, the modifications must comply with the requirements set forth in § 8-127.

The plaintiffs do not contest the redevelopment agency's original finding of blight in 1983. Rather, it is the plaintiffs' claim on appeal that the redevelopment

agency's finding of blight in 1983 was not valid when the agency amended the redevelopment plan in 1998. According to the plaintiffs, the 1998 plan is invalid because it did not contain a renewed finding that the redevelopment area was blighted. The plaintiffs rely primarily on our Supreme Court's decision in *Aposporos* v. *Urban Redevelopment Commission,* supra, 259 Conn. 563, in which the court addressed the identical issue raised in this case. The plaintiffs' reliance on *Aposporos,* however, is misplaced.

In *Aposporos,* the city of Stamford's board of representatives approved an urban renewal plan in March, 1963. Id., 565. The plaintiffs' property, while contained in the area subject to the plan, was not identified as a property that was going to be acquired under the plan. Id. During the mid-1980s, Stamford merchants located in the area subject to the urban renewal plan became concerned about the effect that a new mall being built in another part of the city would have on their businesses. Id., 566. In response to those concerns, the city's board of representatives was asked to recommend new redevelopment goals for the 1963 urban renewal plan. Id. The firm hired by the board of representatives subsequently recommended that the plaintiffs' property be acquired. Id. On March 7, 1988, the board approved the amendments to the 1963 plan, including the taking of the plaintiffs' property. Id. The plaintiffs then sought, among other things, temporary and permanent injunctive relief to prevent the redevelopment commission from taking their property. Id., 568–69. Following a trial in which the trial court denied the plaintiffs' request for an injunction, the plaintiffs appealed to our Supreme Court, claiming, inter alia, that the condemnation was invalid because the redevelopment commission did not make a renewed finding of blight when it amended the original plan. Id., 570.

In reversing the judgment of the court, our Supreme Court stated: "We cannot conclude . . . that a redevelopment agency may make an initial finding of blight and rely on that finding indefinitely to amend and extend a redevelopment plan to respond to conditions that did not exist, or to accomplish objectives that were not contemplated, at the time that the original plan was adopted. To do so would confer on redevelopment agencies an unrestricted and unreviewable power to condemn properties for purposes not authorized by the enabling statute and to convert redevelopment areas into their perpetual fiefdoms." Id., 576–77.

In reaching its conclusion, our Supreme Court relied on the fact that (1) the record did not establish that the original plan was intended to be an " 'incremental, multi-year, integrated plan' "; id., 577; (2) the plaintiffs' property was not sought to be taken until the 1988 amendment was adopted, (3) the objectives of the original plan had largely been achieved when the original plan was amended, (4) the amendment was in response to economic conditions that did not exist at the time the original plan was adopted and (5) the amended plan had objectives distinct from that of the original plan. Id., 577–78.

Our Supreme Court held, however, that its decision did "not require a redevelopment agency to renew a finding of blight if it is merely completing a redevelopment project as initially planned. Rather, the requirement for a renewed finding exists *only* when the agency, long after the original plan was adopted and at a time when the objectives of that plan have been largely achieved, has amended the original plan *to address conditions and achieve objectives that did not exist at the time that the original plan was adopted.*" (Emphasis added.) Id., 580.

In this case, we conclude that the court properly found that the redevelopment agency was not required

to make a new finding of blight when it adopted the 1998 plan. The 1998 plan did not substantially change the 1983 plan. Rather, the 1998 plan merely sought to complete the objectives of the original plan. The 1998 plan was not adopted solely to address economic conditions that did not exist at the time the 1983 plan was adopted. In *Aposporos*, the amendments to the original plan sought to address solely economic concerns arising from a new mall that was being built in another part of the city. In this case, although the 1998 plan sought to capitalize on the changes in the real estate market, the 1998 plan also was in response to changes in state and federal law that prohibited at-grade railroad crossings, which were contemplated in the 1983 plan.

The 1998 plan, adopted fifteen years after the original plan, as opposed to the twenty-five year span between the original plan and the amendment in *Aposporos*, did not change the overall objectives of the 1983 plan. On the contrary, the goals and objectives set forth in the 1983 plan are nearly identical to those set forth in the 1998 plan.[2]

Furthermore, the objectives of the 1983 plan were not largely achieved prior to the adoption of the 1998 plan. As the court found, and the record supports, the objectives of increased office development and public access to the Norwalk waterfront were not achieved when the 1983 plan was amended. Finally, unlike the situation in *Aposporos*, the plaintiffs' properties in this

[2] Both the 1983 plan and the 1998 plan listed as their objectives to (1) create development opportunities for an appropriate mix of uses, (2) increase the tax base of Norwalk, (3) enhance public access to the Norwalk waterfront, (4) increase housing opportunities for Norwalk residents and (5) increase employment opportunities for Norwalk residents. The 1998 plan also sought to (1) identify solutions to the traffic and parking issues, (2) consider visibility and views from the different development parcels and (3) promote a high quality urban environment. The only objective set forth in the 1983 plan that was not set forth in the 1998 plan was to reserve 20 percent of the housing units for low and moderate income residents.

case, under both the 1983 plan and the 1998 plan, always were designated for acquisition and demolition.

Accordingly, we conclude that the court correctly determined that the redevelopment agency was not required to make a new finding of blight when it amended the 1983 plan because the modifications were not substantial.

The judgment is affirmed.

In this opinion the other judges concurred.