## MARITIME VENTURES, LLC, ET AL. *v.* CITY OF NORWALK ET AL.
## (SC 17302)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued September 20, 2005—officially released April 18, 2006

*Michael S. Taylor*, with whom were *Wesley W. Horton* and, on the brief, *Kimberly A. Knox* and *Kenneth J. Bartschi*, for the appellants (plaintiffs).

*Jonathan S. Bowman*, with whom were *Barbara M. Schellenberg* and *Stewart I. Edelstein*, for the appellee (defendant Norwalk redevelopment agency).

*Stephen J. Conover*, for the appellee (intervening defendant French Norwalk, LLC).

*Opinion*

BORDEN, J. The plaintiffs, Maritime Ventures, LLC, and Maritime Motors, Inc., appeal, following our grant of certification,[1] from the judgment of the Appellate Court affirming the trial court's judgment denying the plaintiffs' request for an injunction prohibiting the defendants, the city of Norwalk (city), the Norwalk redevelopment agency (redevelopment agency) and French Norwalk, LLC (French), from acquiring by eminent domain certain properties owned by the plaintiffs. The plaintiffs claim that the Appellate Court improperly concluded that: (1) the redevelopment agency had no duty to consider integrating the plaintiffs' properties into the redevelopment area because the utilization of the properties was not a permitted use under the 1998 amended redevelopment plan; and (2) a new finding of blight was unnecessary in adopting the 1998 amended redevelopment plan. We affirm the judgment of the Appellate Court.

---

[1] We granted the plaintiffs' petition for certification to appeal, limited to the following issues: "(1) Did the Appellate Court properly affirm the trial court's decision permitting the taking of nonsubstandard property within a development area by a redevelopment agency because the use of the property failed to conform to uses permitted under the plan?

"(2) Under the facts of this case, did the Appellate Court properly determine that a new finding of blight was unnecessary in adopting the 1998 revised Reed Putnam urban renewal plan?" *Maritime Ventures, LLC* v. *Norwalk*, 271 Conn. 943, 861 A.2d 514 (2004).

The Appellate Court set forth the following relevant facts and procedural history. "On October 19, 1983, the redevelopment agency, an agency of the city, passed resolution no. 83-5 to approve the 'Urban Renewal Plan for Reed Putnam Project Area' (1983 plan). The 1983 plan described the blighted area subject to the redevelopment plan: 'The Norwalk River area from [Interstate 95] Turnpike to the South Norwalk Business District, and west toward West Avenue, has deteriorated over the past forty years due primarily to the adjacent Norwalk Landfill. This deleterious use, coupled with the heavy industrial nature of the railroad yards and the Danbury branch, has caused properties in the Reed Street and Putnam Avenue corridor to become seriously blighted. Light industrial and commercial uses in the area are antiquated, and the road system is inadequate for modern requirements.'

"Recognizing the 'unique location' of the Reed Street-Putnam Avenue corridor for contributing to Norwalk's revitalization, the 1983 plan identified five objectives to develop the area: (1) to create development opportunities for an appropriate mix of uses, including office, retail, residential, hotel and nonprofit institutions, (2) to increase the tax base of Norwalk, (3) to allow public access to and enjoyment of the Norwalk waterfront, (4) to increase housing for Norwalk residents and (5) to increase job opportunities for Norwalk residents. To achieve its objectives, the 1983 plan set forth, in relevant part, the following proposed actions: 'The Norwalk Redevelopment Agency will acquire and offer for redevelopment those parcels whose condition warrants clearance or whose acquisition is necessary to provide an adequate unit of development. Those buildings compatible with the overall design are designated not to be acquired, and are slated for preservation.' The 1983 plan designated the plaintiffs' properties for acquisition and demolition.

"The common council of the city adopted the 1983 plan on October 25, 1983. In its resolution approving the 1983 plan, the common council recognized that the redevelopment agency had 'made detailed studies of the location, physical condition of structures, land use, environmental influences, feasibility and potential for rehabilitation, and social, cultural and economic conditions of the project area, and has determined that the area is a deteriorated, deteriorating, sub-standard and blighted area and that it is detrimental and a menace to the safety, health and welfare of the inhabitants and users thereof and of the locality at large.'

"In the mid-1990s, the redevelopment agency determined that it was necessary to review the 1983 plan. The redevelopment agency conducted meetings with community groups, elected officials and interested parties, and retained an expert to review the 1983 plan and propose amendments to the plan. The agency subsequently held public hearings on the proposed amendments.

"On November 22, 1996, the redevelopment agency sent a memorandum to the planning committee of the common council regarding the 1983 plan. The memorandum recommended the initiation of discussions on amending the 1983 plan. On December 18, 1996, the redevelopment agency authorized retaining Cecil and Rizvi, Inc., to update and revise the 1983 plan.

"On September 24, 1997, Cecil and Rizvi, Inc., presented to the redevelopment agency its proposed amendments to the 1983 plan. The proposed amended 1983 plan was approved by the Norwalk planning commission on October 15, 1997. . . .

"The redevelopment agency approved the revisions to the 1983 plan on December 17, 1997. Subsequently, on February 10, 1998, the common council approved the amended 1983 plan (1998 plan)." *Maritime Ven-*

*tures, LLC* v. *Norwalk*, 85 Conn. App. 38, 40–43, 855 A.2d 1011 (2004).

"Maritime Ventures, LLC, is a limited liability company in Connecticut and has an ownership interest in Maritime Motors, Inc., a Connecticut corporation. Maritime Motors, Inc., sells and services new and used Chevrolet motor vehicles. On April 18, 2000, Maritime Ventures, LLC, obtained title to 51 West Avenue and 31 Putnam Avenue from Thomas Pellitteri. Maritime Ventures, LLC, then leased the properties to Maritime Motors, Inc., pursuant to an oral lease. The property located at 51 West Avenue has a two-story showroom building and a display parking lot for sixty vehicles. The property located at 31 Putnam Avenue is used to display new vehicles and for storage.

"At the time that Maritime Ventures, LLC, purchased the properties, it knew that the properties were included in the area subject to the 1983 and 1998 plans and were designated for acquisition by either purchase or condemnation. Subsequently, French, the designated redeveloper under the 1998 plan, initiated discussions with the plaintiffs to acquire their properties, but they were unwilling to sell.

"On January 25, 2002, the plaintiffs initiated this action, seeking preliminary and permanent injunctive relief. Specifically, the plaintiffs sought an injunction to prohibit the city from acquiring their properties by eminent domain.

"Following a trial to the court, the court held that the plaintiffs had failed to prove that the decision of the redevelopment agency to acquire the plaintiffs' properties by eminent domain was unreasonable or in bad faith or was an abuse of power. Accordingly, the court denied the plaintiffs' claim for temporary and permanent injunctive relief and rendered judgment in

favor of the defendants." Id., 44–45. Additional facts will be set forth as necessary.

The plaintiffs appealed, and the Appellate Court affirmed the judgment of the trial court. The Appellate Court concluded that the redevelopment agency had no duty to consider integration of the plaintiffs' properties into the redevelopment area and that the 1998 amendment to the redevelopment plan did not necessitate a new finding of blight because the amended plan did not constitute a substantial change from the 1983 plan.[2] Id., 40. This certified appeal followed.

I

The plaintiffs first claim that the Appellate Court improperly concluded that the redevelopment agency had no duty to consider integrating the plaintiffs' properties into the redevelopment area because the utilization of the properties as an automobile dealership was not a permitted use under the 1998 plan. We disagree.

The following additional facts are relevant to the plaintiffs' claim. The trial court found that there had been no evidence presented that the defendants had considered the integration of the plaintiffs' property into the redevelopment plan. The court further found that, although the 1983 plan had listed automobile dealerships as a permitted use on one parcel within the redevelopment area, the plaintiffs' property had always been designated for acquisition and demolition, under both the 1983 plan and the 1998 plan. The 1983 plan listed the following permitted uses: "Redevelopment will include commercial, office, residential, hotel, institutional, public parking, and retail uses, as well as sup-

---

[2] The Appellate Court also rejected the plaintiffs' claim that the trial court improperly concluded that the defendants had taken all reasonable steps necessary to acquire the plaintiffs' properties by negotiation. *Maritime Ventures, LLC* v. *Norwalk*, supra, 85 Conn. App. 50. That issue is not before us in this appeal.

porting public infrastructure and facilities." Regarding the permitted retail uses, the plan specified that such uses "may include personal service stores (such as barbershops, beauty salons and shoe repair shops), banks, travel agencies . . . restaurants, stationary stores, tobacco stores and newsstands. On parcel 4, automobile showroom and service is permitted in conjunction with office use and in the location shown." The provision allowing for automobile dealerships on parcel 4 was eliminated from the 1998 plan, which now identifies only the following permitted retail uses: "[P]ersonal service stores (such as barbershops, beauty salons, and shoe repair shops), banks, travel agencies, restaurants and coffee shops, stationary stores, bookstores, tobacco stores, and newsstands." Neither the 1983 plan nor the 1998 plan expressly specifies any uses that are prohibited in the redevelopment area.

As an initial matter we set forth the applicable standard of review. "To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, 259 Conn. 592, 598, 790 A.2d 1178 (2002).

"[T]he governing principles for our standard of review as it pertains to a trial court's discretion to grant or deny a request for an injunction [are]: A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore,

unless the trial court has abused its discretion, or failed to exercise its discretion . . . the trial court's decision must stand." (Citations omitted; internal quotation marks omitted.) Id.

We also are mindful of the limits on judicial review of a redevelopment agency's decisions implementing a redevelopment plan. By virtue of the Connecticut redevelopment act (act); General Statutes § 8-124 et seq.; the legislature has delegated to municipalities, acting through redevelopment agencies, the authority to exercise the power of eminent domain by taking land that a redevelopment agency has determined to be within a redevelopment area. General Statutes § 8-124;[3] see also *Gohld Realty Co.* v. *Hartford*, 141 Conn. 135,

---

[3] General Statutes § 8-124 declares as a matter of public policy: "It is found and declared that there have existed and will continue to exist in the future in municipalities of the state substandard, insanitary, deteriorated, deteriorating, slum or blighted areas which constitute a serious and growing menace, injurious and inimical to the public health, safety, morals and welfare of the residents of the state; that the existence of such areas contributes substantially and increasingly to the spread of disease and crime, necessitating excessive and disproportionate expenditures of public funds for the preservation of the public health and safety, for crime prevention, correction, prosecution, punishment and the treatment of juvenile delinquency and for the maintenance of adequate police, fire and accident protection and other public services and facilities, and the existence of such areas constitutes an economic and social liability, substantially impairs or arrests the sound growth of municipalities, and retards the provision of housing accommodation; that this menace is beyond remedy and control solely by regulatory process in the exercise of the police power and cannot be dealt with effectively by the ordinary operations of private enterprise without the aids herein provided; that the acquisition of property for the purpose of eliminating substandard, insanitary, deteriorated, deteriorating, slum or blighted conditions thereon or preventing recurrence of such conditions in the area, the removal of structures and improvement of sites, the disposition of the property for redevelopment incidental to the foregoing, the exercise of powers by municipalities acting through agencies known as redevelopment agencies as herein provided, and any assistance which may be given by any public body in connection therewith, are public uses and purposes for which public money may be expended and the power of eminent domain exercised; and that the necessity in the public interest for the provisions of this chapter is hereby declared as a matter of legislative determination."

146, 104 A.2d 365 (1954). Because the redevelopment agency's authority in determining whether a nonsubstandard property is essential to a redevelopment, and thus subject to a taking, derives from the legislature's broad delegation of authority, "the decision of that agency is conclusive . . . . The agency's decision . . . is open to judicial review only to discover if it was unreasonable or in bad faith or was an abuse of the power conferred. . . . The redevelopment agency is permitted to determine, in good faith, what land it is necessary to appropriate in order to accomplish the public purpose. It is proper for a redevelopment agency, acting in pursuance of the act, to fix, within reasonable limits, the area of redevelopment and to include in a taking all property which is in a deteriorated area, even though certain of the properties are not in themselves substandard." (Citations omitted; internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 600.

A " '[r]edevelopment area' " is "an area within the state which is deteriorated, deteriorating, substandard or detrimental to the safety, health, morals or welfare of the community." General Statutes § 8-125 (b). The authority of a redevelopment agency to exercise the power of eminent domain within a redevelopment area is not confined to substandard properties. In fact, the act specifically provides that a redevelopment area "may include structures not in themselves substandard or insanitary which are found to be essential to complete an adequate unit of development, if the redevelopment area is deteriorated, deteriorating, substandard or detrimental." General Statutes § 8-125 (b). Thus, in order for the taking of a nonsubstandard property within a redevelopment area to be justified, the redevelopment agency must have determined that the property is essential to the redevelopment plan. *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 600–

601. In determining whether nonsubstandard property within a redevelopment area is essential to the plan, the redevelopment agency must consider "the condition obtaining as to the entire area and not as to individual properties . . . ." (Internal quotation marks omitted.) Id.; see also *Pet Car Products, Inc.* v. *Barnett,* 150 Conn. 42, 51, 184 A.2d 797 (1962).

We have previously set forth the process by which a redevelopment agency reasonably may arrive at the conclusion that a nonsubstandard property is essential to completing an adequate unit of development. In *Pequonnock Yacht Club, Inc.* v. *Bridgeport,* supra, 259 Conn. 594, the plaintiff's property consisted of two acres of land on which the plaintiff operated a private yacht club and marina. The plaintiff's property, which was not substandard, was located within a redevelopment area, but had not originally been designated for acquisition under the redevelopment plan. Id. In accordance with the most recent revision of the redevelopment plan, however, which did designate the plaintiff's property for acquisition, the city of Bridgeport acquired the property by eminent domain. Id. The trial court subsequently granted the plaintiff an injunction ordering the city to reconvey the property to the plaintiff; id., 596; and this court upheld the trial court's grant of the injunction on the ground that it was unreasonable for the redevelopment agency and the city to fail to consider integrating the plaintiff's property into the redevelopment area. Id., 606. In so holding, we reasoned that by failing to consider whether it was possible to integrate the plaintiff's property into the redevelopment area, the agency failed to make the required determination of whether the taking of the plaintiff's property was essential to the redevelopment. Id.

We grounded our analysis on the principle that a redevelopment agency "must consider whether [the property] could be successfully integrated into the over-

all plan for the area in order to achieve its objective. If [the property] could not be, then the acquisition of the property was essential to complete an adequate unit of development, even though the property was not, in itself, substandard. . . . Conversely, if the property can be integrated, it is logical to conclude that the acquisition is not essential." (Citation omitted; internal quotation marks omitted.) Id., 601. Thus, in *Pequonnock Yacht Club, Inc.*, we held that the determination of whether a nonsubstandard property may be integrated into a redevelopment area is central to the question of whether the taking of that property is essential to the redevelopment plan. Id. Put another way, a redevelopment agency is justified in taking a nonsubstandard property only when that property cannot be integrated into the redevelopment area in accordance with the objectives of the redevelopment plan.

A key distinction between the present case and *Pequonnock Yacht Club, Inc.*, however, is that in that case, we did not consider whether, prior to acquiring a nonsubstandard property in a redevelopment area by eminent domain, a redevelopment agency must consider the integration of such a property even if the use made of the property is not listed as a permitted use under the redevelopment plan. General Statutes § 8-127 requires a redevelopment agency, in initiating the redevelopment plan, to identify permitted uses within the redevelopment area, and provides in relevant part that a redevelopment plan "shall show . . . the general location and extent of use of land for housing, business, industry, communications and transportation, recreation, public buildings and such other public and private uses as are deemed by the planning agency essential to the purpose of the redevelopment. . . ." Thus, the designation of permitted uses within a redevelopment area, the permitted location of those uses and their

scope is an integral part of the agency's formulation of the redevelopment plan.

The parties do not dispute that the 1998 plan does not list automobile dealerships as a permitted use within the redevelopment area. A preliminary question is whether that omission signifies a judgment by the agency that an automobile dealership is a prohibited use under the plan, despite the absence of an express provision in the plan prohibiting such a use. As we have already noted, neither the 1983 plan nor the 1998 plan lists *any* prohibited uses; each plan specifies only which uses are permitted. Moreover, the act does not require a redevelopment agency to list prohibited uses in formulating a redevelopment plan. Based on the lack of any requirement in the act for a redevelopment plan to list prohibited uses, and the failure of both the 1983 and 1998 plans to do so, the only reasonable conclusion is that a redevelopment plan's list of permitted uses is intended to be exclusive. In other words, any use that is not listed as permitted is prohibited under the plan. To hold otherwise would require a redevelopment agency to list every possible use that the agency has determined should be prohibited under the redevelopment plan, regardless of how absurd or unreasonable it would be to include such a use within the redevelopment area, or else face a claim that such a use, because it is not listed as prohibited, is permitted. For example, under this theory, if the redevelopment plan did not list hog rendering factories as a prohibited use, such a use would be presumed to be permitted under the plan.

Furthermore, requiring a redevelopment agency to list all prohibited uses would be inconsistent with the broad delegation of authority to those agencies by the legislature, thus inviting courts to second guess a redevelopment agency's decisions regarding which uses are permitted within a redevelopment area and which uses are prohibited. As we consistently have stated, a rede-

velopment agency's exercise of its discretion is subject to judicial review only for unreasonableness, abuse of power or bad faith. See, e.g., *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, supra, 259 Conn. 600; *Gohld Realty Co.* v. *Hartford*, supra, 141 Conn. 146. Requiring courts to speculate regarding a redevelopment agency's intent in omitting a given use as permitted under a redevelopment plan is inconsistent with that narrow scope of judicial review and would amount to judicial encroachment on the agency's exercise of the broad discretion delegated to it by the legislature. Lastly, a presumption that uses not permitted by the plan are not necessarily prohibited would render meaningless the requirement that the agency list permitted uses. For all these reasons, we conclude that because automobile dealerships are not listed as a permitted use under the 1998 plan, such a use is prohibited.[4]

In light of this conclusion, the question becomes, then, whether a redevelopment agency should be required to consider the integration into a redevelopment area of a use that the agency has already determined is prohibited under the redevelopment plan. We conclude that such a requirement may not be imposed upon redevelopment agencies. Once again, our analysis is guided by the legislature's broad delegation of authority to redevelopment agencies. It would be inconsistent with that broad delegation of authority for us to impose an obligation upon redevelopment agencies to consider whether a use that the agency already has determined is prohibited under the plan may nevertheless be integrated into the redevelopment area. Essentially, we

---

[4] The facts of the present case make it particularly clear that the redevelopment agency, in omitting automobile dealerships as a permitted use in the 1998 plan, intended that use to be prohibited within the redevelopment area because the amendment of the plan specifically eliminated "automobile showroom and service" from the list of uses permitted under the 1983 plan. Such an affirmative step makes the agency's intent to prohibit that specific use particularly clear.

would be requiring the agency to revisit its initial decision not to list the use as one permitted under the plan. This requirement would place an undue burden upon redevelopment agencies and render meaningless the initial determination of which uses should be permitted under the plan, requiring the agency to determine, on a case-by-case basis, each time it attempts to take any given property, whether that use is one that should be permitted within the redevelopment area. That determination, however, is one that the agency has already made by designating, pursuant to § 8-127, specific uses as permitted under the plan, implicitly determining that all other uses are prohibited, and making the determination based on its assessment of what uses are essential to include within the redevelopment area in order to accomplish the objectives of the plan. Therefore, we conclude that because the redevelopment agency did not list automobile dealerships as a permitted use under the 1998 plan, the agency had no duty to consider whether the plaintiffs' properties could be integrated into the redevelopment area prior to taking the properties.

This conclusion is consistent with our holding in *Pequonnock Yacht Club, Inc.* v. *Bridgeport,* supra, 259 Conn. 592. As we stated previously in this opinion, our holding in that case was that a redevelopment agency is justified in taking a nonsubstandard property only when that property cannot be integrated into the redevelopment area in accordance with the objectives of the redevelopment plan. Id., 601. A property that exercises a use prohibited by the redevelopment plan cannot, by definition, be integrated into the area, because the agency, in formulating the plan in accordance with the plan's objectives, has already made the decision that the use is one that is inconsistent with those objectives. Therefore, the taking of a property that exercises a prohibited use is essential to accomplish those objec-

tives. As we have already stated, requiring the agency to consider integrating such a property would impose an undue burden upon a redevelopment agency to reconsider what it already had decided in its initial formulation of the plan and would constitute an improper limit on the scope of the agency's discretion as delegated to it by the legislature.

We find unpersuasive the plaintiffs' claim that our conclusion will yield the result that the power of redevelopment agencies to take properties within a redevelopment area will be unchecked. As we have already noted, the agency's decision is subject to judicial review for abuse of power, unreasonableness and bad faith. The plaintiffs have not challenged the agency's decision on any of these grounds. They have pointed to nothing in the record to suggest that the redevelopment agency, in failing to consider integrating the plaintiffs' properties into the redevelopment area, had acted in bad faith.[5] Moreover, generally speaking, we note that we find nothing inherently unreasonable in the agency's refusal to consider integrating into a redevelopment area a property that employs a use that the agency has already determined is prohibited. On the contrary, as we have already explained, it would be unreasonable to impose such a requirement upon a redevelopment agency. Neither does such a refusal to consider integration necessarily constitute an abuse of power—it is, in fact, consistent with the exercise of the discretionary authority delegated to the agency by the legislature.

Equally unpersuasive is the plaintiffs' argument that creating an "exception" for prohibited uses, to the

---

[5] The plaintiffs speculate that our conclusion will yield the result that a redevelopment agency may avoid its duty to consider whether a desired property may be integrated merely by designating the use of that property as not permitted under the redevelopment plan. Under those circumstances, however, the agency would be acting in bad faith. Thus, its decision would be subject to judicial review. The plaintiffs do not allege, however, that in the present case, the agency has acted in such a manner.

requirement that redevelopment agencies consider the possibility of integrating nonsubstandard properties into a redevelopment area before taking such properties, undermines the constitutional and statutory protections afforded by the requirement that nonsubstandard property be taken only where it is essential to do so. First, the plaintiffs misconstrue our conclusion as creating an exception. On the contrary, as we have already stated, our holding is consistent with the general rule that a redevelopment agency is justified in taking properties only when that taking is essential in order to accomplish the objectives of the plan. The mere fact that the determination of the essential nature of the taking has been made at the time that the plan was formulated, through the agency's designation of uses permitted under the plan, rather than in the subsequent implementation of the plan, does not mean that the determination has not been made. Essentially, the plaintiffs argue that they are entitled to a second, individual determination of whether the use that their property employs is inconsistent with the redevelopment plan. The judicial imposition of such a burden on a redevelopment agency would constitute an improper limit on the scope of the agency's discretion.[6]

## II

The plaintiffs next argue that the Appellate Court improperly concluded that the redevelopment agency was not required to make a new finding of blight in adopting the 1998 plan. *Maritime Ventures, LLC* v.

---

[6] The plaintiffs also intimate that a property that employs a prohibited use within a redevelopment area should be treated similarly to a nonconforming, preexisting use under General Statutes § 8-2 (a), which authorizes zoning commissions to pass zoning regulations, and provides in relevant part that "[s]uch regulations shall not prohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations. . . ." First, we note that § 8-2 (a) is not part of the redevelopment act. Second, the two situations are not analogous, because of the broad scope of authority vested in redevelopment agencies.

*Norwalk*, supra, 85 Conn. App. 55–56. We disagree. We agree with the Appellate Court's conclusion that no new finding of blight was required in adopting the amended plan, although we arrive at that conclusion on the basis of a different analysis. We conclude that, in amending a redevelopment plan, a redevelopment agency is required to make a finding of blight only when the supposed amendment effects such a radical change on the plan, by addressing new conditions and setting forth new objectives that do not relate to the original finding of blight, that the amendment in actuality constitutes a new redevelopment plan.

The following additional facts are relevant to this claim. The 1983 plan provided for the construction of office buildings on the landfill. Subsequent changes in environmental laws, however, limited development on the landfill, which was instead converted into Oyster Shell Park. The plaintiffs claim that this change in the utilization of the landfill resulted in the designation of the plaintiffs' property for use as office space.[7] Other changes proposed by the 1998 plan that the plaintiffs claim would impact their property are the proposed construction of an underpass at Reed Street to cross the railroad tracks and the widening of West Street to accommodate anticipated traffic flow into the redevelopment area.

Proper access to the redevelopment area was of particular concern in formulating the redevelopment plan because the Danbury branch of the New Haven railroad bisects the area, existing underpasses do not provide sufficient clearance for full size tour buses and tractor trailer trucks to gain access to the area, and the existing roadways that serve as gateways to the area are not sufficiently wide to allow for anticipated traffic flow.

[7] Under the 1983 plan, the plaintiffs' property was designated for the development of housing.

The 1983 plan provided for an at grade crossing over the railroad tracks at Crescent Street extending on to the landfill. This change would not have impacted the plaintiffs' properties. For a number of reasons, however, including state and federal prohibitions of at grade railroad crossings, the trial court found that an at grade crossing of the railroad tracks is no longer an option.[8] After adopting the 1983 plan, the agency commissioned several traffic studies to address the traffic flow issues in the area, particularly the problem of the railroad crossing. One study conducted shortly after the plan's passage recommended that primary access to the redevelopment area be accomplished by widening Crescent Street and extending it to the landfill by building a bridge over the railroad.[9] Subsequent studies released prior to the passage of the 1998 plan recommended instead that access to the redevelopment area be accomplished by creating an underpass at Reed Street.[10] The reasons advanced in favor of the Reed Street underpass included that it would be less expensive than the Crescent Street Bridge and would provide more direct access to the area, particularly to the Norwalk Maritime Aquarium, from Interstate 95. The 1998 plan proposes to accomplish the railroad crossing by building the Reed Street underpass. Additionally, a study conducted subsequent to the passage of the 1998 plan has recommended that in order to accommodate anticipated traffic flow, it will be necessary to widen West Avenue, which abuts the plaintiffs' property.[11] These two

[8] The Connecticut statute prohibiting at grade railroad crossings, General Statutes § 13b-268 (b), became effective on October 1, 1989.

[9] The study was released in July, 1987, by Greiner Engineering Sciences.

[10] Two studies recommended this option: a study released on May 20, 1991, by Urbitran Associates, and a study released by Hardesty and Hanover in June, 1992. The Norwalk department of public works also commissioned a separate study, which ruled out a third option for crossing over the railroad tracks into the redevelopment area, an upgrade of the existing crossing at Ann Street.

[11] This study was commissioned from Allan Davis Associates in 1999.

changes would require taking a significant portion of the plaintiffs' property.

The Appellate Court detailed the procedures that the agency followed in adopting the 1998 plan. "In November, 1997, the redevelopment agency sent a letter to the property owners within the Reed Street-Putnam Avenue area, inviting them to a public information session, followed by a public hearing, on the proposed amended 1983 plan. The redevelopment agency also published notice of the information session and public hearing in the Norwalk Hour newspaper. The information session and public hearing were held on November 19, 1997. . . .

"The 1998 plan states that the 1983 plan was amended because: 'There have been significant changes [since the 1983 plan was initially approved] in the regulations pertaining to environmental controls on development, as well as in the regional economy affecting the area real estate markets. The [1983] Plan has been revised and restated herein to provide a better fit between the goals of the community and the development opportunities available. This includes not only matching development parcels with prospective users, but also a better articulation of objectives relating to urban design and landscape requirements, in order to ensure development of a high quality environment consistent with the long term planning goals of the [city].'

"The 1998 plan described the scope of its revisions: 'In general, the overall approach and structure of the original Plan as established by State statute have been maintained. However, changes have been introduced to the parcelization patterns, land use plan, urban design guidelines, and regulations on development. These revisions are intended to capitalize on the current development potential of the area without losing sight of the

general objectives originally identified by the [1983] Plan and the best interests of the [c]ity.'

"In addition to retaining the same objectives as the 1983 plan, the 1998 plan also sought to (1) identify solutions to the traffic and parking issues generated by the new developments, (2) consider views and visibility from different development parcels, and (3) promote a high quality urban environment. The 1998 plan addressed the same revitalization area as did the 1983 plan." *Maritime Ventures, LLC* v. *Norwalk*, supra, 85 Conn. App. 42–43. It is undisputed that in adopting the 1998 plan, the redevelopment agency did not make an additional finding of blight.

Section 8-127 sets forth the procedures that a redevelopment agency must follow in adopting a redevelopment plan, providing in relevant part that "[b]efore approving any redevelopment plan, the redevelopment agency shall hold a public hearing thereon, notice of which shall be published at least twice in a newspaper of general circulation in the municipality, the first publication of notice to be not less than two weeks before the date set for the hearing. The redevelopment agency may approve any such redevelopment plan if, following such hearing, it finds that: (a) The area in which the proposed redevelopment is to be located is a redevelopment area . . . ." In order to find that the area is a redevelopment area, the agency must determine that it is "deteriorated, deteriorating, substandard or detrimental to the safety, health, morals or welfare of the community," or, in other words, blighted. General Statutes § 8-125 (b).

General Statutes § 8-136[12] governs modification of a redevelopment plan. It provides that a redevelopment

_____

[12] General Statutes § 8-136 provides: "A redevelopment plan may be modified at any time by the redevelopment agency, provided, if modified after the lease or sale of real property in the redevelopment project area, the modification must be consented to by the redeveloper or redevelopers of such real property or his successor or their successors in interest affected

agency may, subject to certain conditions, modify its redevelopment plans. Those conditions are as follows: If the property in the redevelopment area has been leased or sold, the redeveloper "of such real property," or the redeveloper's "successors in interest affected by the proposed modification," namely, the lessee of or a grantee from the redeveloper of such leased or sold property, must consent to the modification. General Statutes § 8-136. In addition, if the "proposed modification" will substantially change the redevelopment plan, the legislative body of the municipality must also approve the modification. General Statutes § 8-136. Therefore, when a modification effects a substantial change of the original plan, the agency must obtain both the consent of the redeveloper and any lessees and grantees who acquired the property prior to the proposed modification, and the approval of the legislative body. Nothing in § 8-136, however, indicates that such legislative approval must be premised upon a renewed finding of blight.

*Aposporos* v. *Urban Redevelopment Commission,* 259 Conn. 563, 790 A.2d 1167 (2002), is not to the contrary. In *Aposporos,* we set forth the standards relevant to our review of whether a redevelopment agency followed the proper procedures required by the act in taking land. "The authority to condemn is to be strictly construed in favor of the owner and against the condemnor, and the prescribed method of taking must be strictly pursued. . . . The rule applicable to the corporate authorities of municipal bodies is that when the mode in which their power is to be exercised is prescribed, that mode must be followed. . . . When essential steps are not taken as required by the statute for

by the proposed modification. Where the proposed modification will substantially change the redevelopment plan as previously approved by the legislative body, the modification must similarly be approved by the legislative body."

the adoption of a redevelopment plan, the purported plan, as well as any attempted approval of it and any action taken under it, are invalid." (Citations omitted; internal quotation marks omitted.) Id., 573.

In our decision today, we make explicit what was implicit in our decision in *Aposporos*, namely, that no renewed finding of blight is required for approval of a modification to a redevelopment plan unless the "amended" plan resulting from such modification is in fact not merely an amended plan, but a new plan. In *Aposporos*, we concluded that a redevelopment agency is required to make a new finding of blight "only when the agency, long after the original plan was adopted and at a time when the objectives of that plan have been largely achieved, has amended the original plan to address conditions and achieve objectives that did not exist at the time that the original plan was adopted." Id., 580.

In explicating the meaning of that holding, it is helpful to set forth in brief the facts of that case. The original redevelopment plan in *Aposporos* was approved in 1963. Id., 565. The plaintiffs operated a diner on their property, which was located within the redevelopment area in the city of Stamford (city). The property, however, had not been designated for acquisition under the 1963 plan. Id., 566. In the mid-1980s, local merchants expressed concern regarding the impact that the construction of a new mall in a part of the city outside the redevelopment area may have on their businesses. In response to those concerns, the city's urban redevelopment commission (commission) proposed amendments to the 1963 plan and recommended new goals under the amended plan. Id. In 1988 the city's board of representatives (board) approved the commission's recommended amendments. Id. Under the 1988 amended plan, four additional properties, including the plaintiffs' property, were designated for acquisition. Id. The planned

development on those properties fell through because of a downturn in the real estate market, and the board extended the plan to March 4, 2000. Id., 567. After the market had begun to recover and another development project was underway, the commission attempted to acquire the plaintiffs' property. Id. We reversed the trial court's judgment denying the plaintiffs temporary and permanent injunctive relief, concluding that, in the absence of a new finding of blight, the commission did not have authority to take the plaintiffs' property. Id., 579–80. In so holding, we considered the practical problem presented by the imposition of a requirement on a redevelopment agency to make a renewed finding of blight after the implementation of the redevelopment plan was already under way. Id., 580. Specifically, we agreed with decisions from other jurisdictions that "[a] logical consequence of the implementation of a redevelopment plan in any particular area is that some conditions of blight which once existed will be eliminated. Therefore, it is unreasonable to expect that the [redevelopment agency] demonstrate the existence of the same level of blight [at the time eminent domain proceedings are initiated] that was present when the redevelopment plan was initially adopted . . . ." (Internal quotation marks omitted.) Id., 576. We concluded, therefore, that imposing such an obligation on redevelopment agencies at each stage of the implementation of the plan would be "illogical and unfair . . . ." Id.

On the other hand, we recognized that the agencies' ability to rely on an initial determination of blight was not without limit. "We cannot conclude . . . that a redevelopment agency may make an initial finding of blight and rely on that finding indefinitely to amend and extend a redevelopment plan to respond to conditions that did not exist, or to accomplish objectives that were not contemplated, at the time that the original plan was adopted. To do so would confer on redevelopment

agencies an unrestricted and unreviewable power to condemn properties for purposes not authorized by the enabling statute and to convert redevelopment areas into their perpetual fiefdoms." Id., 576–77. We suggested that the factual situation in *Aposporos* exemplified exactly the type of unchecked reliance on an initial finding of blight to convert a redevelopment area into a "perpetual fiefdom" that would be impermissible, because the "amendment" at issue in *Aposporos* was "approved decades after the original plan was adopted that addresses conditions and seeks to achieve objectives that were not contemplated in that plan. Such an amendment effectively constitutes, and should be subject to the same procedural requirements as, a new redevelopment plan." Id., 577. Thus, in *Aposporos*, we drew a distinction between modifications of, or amendments to, a redevelopment plan, which are implementations of the original plan aimed at eradicating the blight identified by the agency when it originally adopted the redevelopment plan, and a *purported* amendment to a redevelopment plan, which addresses new conditions and is aimed at new objectives that do not relate to the original finding of blight and is, therefore, not an amendment at all, but, rather, a new plan.

The present case involves, not a new redevelopment plan, but merely a modification of the original plan. The amended plan at issue is distinguishable from the new plan involved in *Aposporos* for a number of reasons. First, and most importantly, unlike the new plan at issue in *Aposporos*, the 1998 amended plan in the present case did not identify new redevelopment goals. Indeed, the 1998 plan made only a minor change to the goals identified in the 1983 plan, deleting the provision that would have set aside 20 percent of the housing created within the redevelopment as low and moderate income housing. Otherwise, the goals of the 1983 and 1998 plans are identical. In fact, the trial court expressly

found that there was insufficient evidence that the goals of the 1983 plan had largely been achieved, and that the modifications adopted in the 1998 plan appeared to be intended to address the same conditions as the 1983 plan. Additionally, the present case does not involve an amendment adopted in response to a "discrete economic condition that did not exist at the time that the [original] plan was adopted . . . ." Although the real estate market had fluctuated between the adoption of the 1983 and 1998 plans, and in particular an increased demand for office space was one of the factors that prompted the proposal to utilize the plaintiffs' property as office space, the 1983 plan had always identified as one of its objectives to "[c]reate development opportunities for an appropriate mix of uses, including office, retail, residential, hotel and non-profit institutions." The fact that the plaintiffs' property was designated to be used as office space in the 1998 plan, instead of housing, as under the 1983 plan, is merely a change in the implementation of an objective that had always been part of the redevelopment plan, not a response to a discrete economic condition that did not exist at the time of the adoption of the original plan. Moreover, the real estate market is always in flux. If a property owner seeking to establish a change in conditions sufficient to require a redevelopment agency to make a new finding of blight could simply point to a fluctuation in the real estate market, without more, a redevelopment agency would be required to make a new finding of blight virtually every time it sought to modify a redevelopment plan.

In summary, unlike the changes in the redevelopment plan at issue in *Aposporos*, the changes at issue in the redevelopment plan in the present case are mere modifications of the original plan, and do not establish that the 1998 plan was a new plan. Instead, the modifications in the 1998 plan were aimed at accomplishing the same

objectives as the 1983 plan; it was merely the implementing of the *means* of accomplishing those goals that had changed. Specifically, the relocation of office space to the plaintiffs' property rather than on the landfill, a response to a partial implementation of the plan by converting the landfill into Oyster Shell Park, did not create a new goal, and was not a response to a discrete change in conditions. The only change was that the landfill was no longer available for the implementation of one of the plan's objectives. Similarly, the relocation of the proposed railroad crossing from Crescent Street to Reed Street was merely a change in implementation. The objective, increasing public access to the area, had not changed. The 1998 plan simply proposed to accomplish that same objective through a different means.

The plaintiffs contend that the redevelopment agency was required to make a new finding of blight in adopting the 1998 plan because the amendment constituted a "substantial change" of the original plan pursuant to § 8-136. The plaintiffs' argument is premised on an incorrect interpretation of § 8-136. Essentially, the plaintiffs contend that § 8-136 requires that, in the event that an amendment to a redevelopment plan effects a substantial change to the original plan, the redevelopment agency must follow the procedural requirements set forth in § 8-127 for adopting a new redevelopment plan. They point to the last sentence in § 8-136, which provides: "Where the proposed modification will substantially change the redevelopment plan as previously approved by the legislative body, the modification must *similarly* be approved by the legislative body." (Emphasis added.) The plaintiffs infer from the word "similarly" that the approval process upon a modification that effects a substantial change in a redevelopment plan must be identical to that set forth in § 8-127, and, therefore, requires a new finding of blight. Although that is a plausible interpretation of the language, it is not the most logical one. Instead, we read the last sen-

tence of § 8-136 in the context of the entire statute, which first provides that for *any* modification, the redevelopment agency must obtain the consent of the redeveloper. In the case of a substantial change, however, § 8-136 requires that the modification, in addition to being consented to by the redeveloper, "must similarly be approved by the legislative body."[13]

This interpretation of the meaning of the word "similarly" is more persuasive for several reasons. First, the plaintiffs' interpretation would require us to impose upon redevelopment agencies the obligation of making a renewed finding of blight while in the middle of the implementation of a redevelopment plan, the imposition of which we have already determined would be illogical and unfair. Second, under the plaintiffs' interpretation, we would have to read "similarly" as meaning "identical" rather than "comparable" or "analogous," because the plaintiffs advocate that we should interpret § 8-136 as imposing upon the redevelopment agency the obligation to follow, in adopting a modification that effects substantial changes to a plan, the exact procedures set forth in § 8-127, not merely "similar" procedures. Lastly, there is no reference in § 8-136 to § 8-127. It makes much more sense to interpret the word "similarly" as referring to the previous sentence in the same statute, rather than as an oblique reference to a statute that the legislature could easily have enumerated had it intended such a reference.

The plaintiffs next claim that environmental laws passed subsequent to approval of the 1983 plan, which prevented the utilization of the landfill for office space,

---

[13] We note that the trial court and Appellate Court relied on the same interpretation of § 8-136 as that advocated by the plaintiffs, but concluded that the 1998 amended plan did not effect a substantial change to the 1983 plan. We have already noted in this opinion that although we arrive at the same conclusion as the Appellate Court, that is, that the redevelopment agency was not required to make a new finding of blight in adopting the 1998 plan, we disagree with the Appellate Court's analysis of the plaintiffs' claim.

constitutes a change of conditions sufficient to require a new finding of blight. Although the changes in environmental laws indisputably affected the implementation of the plan, the change did not require the agency to change the objectives of the plan, as in *Aposporos*. Rather, the modified environmental laws required merely that the agency change the means of implementing the original plan by altering the proposed use of the plaintiffs' property—designating it for use as office space rather than housing. Although this shift is undeniably a change in implementation, what is essential in determining that the 1998 plan is a modification, rather than a new plan, is that the new means proposed by the amended plan still relate to, and are aimed at, eradicating the original blight in the redevelopment area. Put another way, the present case is not like *Aposporos*, where an "amendment" addressed an entirely new problem, one that did not exist and played no part in the original adoption of the redevelopment plan. The problem addressed by the 1998 plan in the present case is the very same one that drove the redevelopment agency to adopt the 1983 plan. The 1998 plan simply adapts the original one in a way better to accomplish the very same goals as the original plan.

Lastly, the plaintiffs point to the fact that the agency held public hearings, following many of the procedural steps required under § 8-127, to approve a new redevelopment plan. Based on the fact that the agency followed some of the procedures required by § 8-127, the plaintiffs ask us to infer that the agency was therefore additionally required to make a finding of blight as required under that section. We cannot infer such an obligation based on the agency's voluntary and discretionary acts in informing the public of the modifications to the 1983 plan.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.